IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIEP X. HOANG, ) | 03cv2910 |
| ) | |
| Plaintiff, ) | No. 03 C 2910 |
| ) | |
| v. ) | Judge Ronald A. Guzmán |
| ) | |
| ABBOTT LABORATORIES, ) | |
| KATHERINE GREEN, KENNETH ) | |
| A. WILSON and MAURIZO ) | |
| ACQUASALIENTE, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued Abbott Laboratories, Katherine Green, Kenneth A. Wilson and Maurizo Acquasaliente for their alleged violation of her rights under Title VII, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and state tort law. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 on Counts I-IV, VI and VII of the fourth amended complaint and to strike various of plaintiff's submissions.[1] For the reasons set forth below, the Court grants the summary judgment motion and strikes as moot defendants' motions to strike.

### Facts[2]

In April 1993, Abbott hired Hoang as a technician in its microbiology laboratory. (Defs.' LR 56.1(a)(3) Stmt. ¶ 1.) In April 1994, Hoang applied for and received a position as a laboratory

---

[1]The Court dismissed Counts V and VIII in March 2005. (*See* 3/17/05 Min. Order.)

[2]Unless noted otherwise, the following facts are undisputed.

technician on Abbott's Clarithromycin project ("the Clari Group"). (*Id.*) While she was in the Clari Group, Abbott promoted Hoang to the position of associate scientist, a position she held until Abbott terminated her in January 2002. (*Id.* ¶¶ 1, 30.)

While she was in the Clari Group, plaintiff's direct supervisor was group leader John Adamek. (*Id.* ¶ 2.) Adamek reported to Stephen Montgomery. (*Id.*) By the end of 1994, however, Montgomery had transferred to the Ritonavir/Lopinavir Group. (*Id.*)

In January 1997, Hoang and Montgomery began exchanging personal notes and emails. (*Id.* ¶ 3.)

In April 1998, Abbott gave Hoang its Scientist of the Year Award for work she did in the Clari Group during 1997. (Pl.'s LR 56.1(b) Stmt., Ex. F, Hoang Dep. at 401.) Montgomery nominated her for the award. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12.)

In September 1998, Hoang and Montgomery spent several hours in a hotel room at O'Hare airport engaging in sexual activity. (Pl.'s LR 56.1(b) Stmt., Ex. A, Montgomery Dep. at 29-31; *id.*, Ex. F, Hoang Dep. at 345-49.) Plaintiff says her participation was coerced, an assertion Montgomery disputes. (*Id.*, Ex. F, Hoang Dep. at 347; *Id.*, Ex. A, Montgomery Dep. at 30-31.) The next day, plaintiff began a medical leave of absence for anxiety. (*Id.*, Ex. A, Montgomery Dep. at 28-29; *id.*, Ex. F, Hoang Dep., Hoang Dep. Ex. 20, 10/21/98 Disability Form.)

In January 1999, while Hoang was on medical leave, Montgomery left the Ritonavir/Lopinavir Group and became the section manager of the Clari Group. (*Id.*, Ex. A, Montgomery Dep. at 27-29.)

Hoang returned to work on February 2, 1999. (*Id.* at 29.) That afternoon, Montgomery kissed and fondled Hoang in her laboratory. (*Id.*, Ex. F, Hoang Dep. at 358-59.) The next day, she learned that she had been reassigned from the Clari Group to the Ritonavir/Lopinavir Group. (*Id.*,

Ex. A, Montgomery Dep. at 29.) Montgomery says he does not know why she was transferred. (*Id.* at 27.)

Several days later, Hoang followed Montgomery to an empty office where he kissed and fondled her again. (*Id.*, Ex. F, Hoang Dep. at 360-61.) At some point in the same month, Montgomery asked Hoang to sleep with him, but she refused. (*Id.* at 362.)

At the end of February 1999, Montgomery wrote the self-evaluation portion of Hoang's performance review for 1998. (*Id.*, Ex. A, Montgomery Dep. at 52-53.)

It is not clear whether Montgomery had any other physical contact with Hoang between March and June 1999. At some point during the summer of 1999, however, Montgomery took Hoang into a closet where she performed oral sex on him. (*Id.*, Ex. F, Hoang Dep. at 364-65.) She did so, she says, because she was "scared of him." (*Id.* at 365).

In August 1999, Montgomery visited Hoang's cubicle and kissed her. (*Id.* at 361-63.) Apparently, the two had no physical contact for the next year. (*Id.* at 362-63.)

The last time Montgomery touched Hoang in any way was in the summer of 2000, when he touched her face. (*Id.* at 363-64.)

In March and April 2001, Hoang began sending multiple emails to Montgomery and other members of the Clari Group requesting information about the status of projects on which she had worked. (*See, e.g.,* Pl.'s LR 56.1(b), Ex. A, Montgomery Dep. Ex. 3, Email from Hoang to Adamek of 4/6/01; *id.*, Montgomery Dep. Ex. 4, Email from Hoang to Hodkinson of 4/6/01.) On at least two occasions in the spring of 2001, Montgomery told members of the Clari Group to ignore Hoang's emails. (*See id.*)

In May 2001, Hoang complained to Human Resources Manager Laura Kroc that Montgomery had sexually harassed her by touching her hand, arm and face and following her to the cafeteria and

train station. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6.) Because Kroc was moving to a new job, she told Human Resources Director Cynthia Perez about Hoang's complaint. (*Id.*)

In June 2001, Perez met with Montgomery, who denied that he had harassed Hoang. (*Id.* ¶ 7.) Afterward, Perez reported Montgomery's response to Hoang and asked her if she had anything else to add. (*Id.* ¶ 8.) Hoang said that Montgomery had recently visited her cubicle at her request but said nothing about the other physical contact the two had allegedly had. (*Id.*)

During this meeting, Perez also asked Hoang about the emails she had been sending to Montgomery, Adamek and Mel Hodkinson concerning the fate of the work she had done with the Clari Group. (*Id.* ¶ 9.) Perez told Hoang to direct any future questions about that work to her manager, defendant Kenneth Wilson, because some of the email recipients had complained about the emails Hoang was sending. (*Id.*)

In August 2001, Acquasaliente suggested, in response to Hoang's email inquiries about the Clari work, that he, Hoang and Montgomery meet to discuss her ideas. (*Id.*, Ex. A, Montgomery Dep, Montgomery Dep. Ex. 17, Email from Acquasaliente to Montgomery of 8/28/01.) That meeting, however, was never held. (*Id.*, Ex. A, Montgomery Dep. at 102.)

On October 1, 2001, defendant Acquasaliente, who had previously worked with Hoang in the Clari Group, became Hoang's group leader in the Ritonavir/Lopinavir Group. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 10-11.) Hoang felt that Acquasaliente had stolen her ideas and taken credit for her work when they worked in the Clari Group. (*Id.* ¶ 11.) When Acquasaliente asked Hoang to attend one-on-one meetings with him, as he held with the other members of the group, she refused. (*Id.* ¶ 10.) Acquasaliente discussed Hoang's refusal with defendant Human Resources Manager Katherine Green. (*Id.* ¶ 11.)

4

In November 2001, Hoang had two meetings with Green and Wilson, who was Acquasaliente's supervisor, and a third meeting with Green, Wilson and Acquasaliente. (*Id.* ¶ 12.) In the first meeting, the one that Acquasaliente attended, Hoang was told that she had to report to Acquasaliente and notify him if she called in sick, and "would have to give up her ideas and projects." (*Id.* ¶ 13.)

In the second meeting, Hoang told Wilson and Green that she would not meet with Acquasaliente because "she could not face those Clari people." (*Id.* ¶ 15 (quotation omitted).) Green and Wilson told Hoang that she had to attend meetings with Acquasaliente and "could not work on her ideas." (*Id.* (quotation omitted).) Green also told Hoang that she could be reassigned to the Fermentation Group if she did not want to work with Acquasaliente. (*Id.* ¶ 16.)

The last meeting occurred on November 20, 2001. (*Id.* ¶ 17.) During that meeting, Hoang said Green tried to force her to accept a position in the Fermentation Group. (*Id.*) Hoang, who said she "felt intimated by [Green's] actions" and "was afraid to go to work again," did not return to work after that date. (*Id.*; *id.*, Ex. F, Hoang Dep. at 123-24.)

On November 21, 2001, Wilson sent a letter to Hoang, that said:

Your unwillingness to talk with or attend any of the meetings requested by [Acquasaliente] is considered a serious disregard for the direction of your manager. On October 26, 2001, Kathy Green from human resources met with you to discuss this matter. At that meeting you indicated that you were "uncomfortable" with the very idea of having to attend meetings with anyone – including [Acquasaliente] – who might have previously worked in the clari group. . . .

[Y]ou have to date not responded to any of [Acquasaliente's] meeting requests. Because we are not willing to let this conduct to persist, we are giving you the option of being reassigned to another area – doing the same or similar duties to those you currently perform. . . .

We are voluntarily offering you this alternative job assignment to give you the opportunity to perform in an environment that you might find more "comfortable."

5

> However, as discussed in our meeting yesterday, you need to make a decision to accept or decline this alternative job assignment by next week Monday, November 26, 2001. If you accept this alternative job assignment, you will attend a weekly one-on-one meeting with me during the two to three weeks preceding your move. If you choose to remain in your current position, you will be required to regularly attend one-on-one meetings and section meetings with [Acquasaliente]. Failure to comply with the sort of meeting requests described above would be viewed as insubordination and could lead to serious corrective action up to and including termination.

(Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 11, Letter from Wilson to Hoang of 11/21/01.)

Hoang acknowledged receiving the letter but did not respond to it. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 18-19.)

On November 28, 2001, Abbott sent Hoang information about applying for short-term sick pay. (*Id.*, Ex. 9, Hoang Dep. Ex. 25, Letter from Williams to Hoang of 11/28/01.)

On November 29, 2001, Wilson wrote a second letter to Hoang, saying:

> [Y]ou have not yet accepted or declined the voluntary offer for an alternative job assignment . . . . Because attempts to get in touch with you by phone have not been successful[,] I am for a second time writing to solicit a response from you.
>
> . . .
>
> **It is important that you contact me immediately to inform me of your decision. Although I would prefer to speak with you directly, you can leave me a phone message or send me an e-mail with your reply.**
>
> Along with the need to resolve the above-mentioned matter, your attendance record and repeated e-mail inquiries about the clari and lopinavir/rotinavir work groups are both issues that must be addressed. . . .
>
> Our records show that you have accumulated over 100 hours of hourly sick time within the months of October and November combined. Prior to that time you had, between the months of June and September[,] accumulated thirty-six hours of hourly sick time. This pattern and number of intermittent absences is excessive.
>
> I am aware that you have been offered the opportunity to request Family Medical Leave of Absence (FMLA) for several of your more recent absences. In addition it is my understanding that your current absence will be subject to review under

> Abbott's "weekly sick" guidelines for temporary disability benefits. However, if it is determined that a majority of your absences, particularly during the months of October and November, are not FMLA based and/or not supported by objective medical reasons, you may be subject to corrective action for poor attendance.
>
> . . .
>
> I explained to you on numerous occasions that you are not to communicate via e-mail or otherwise with individuals both inside and outside of Technical Operations regarding the clari group. I am disappointed that you continually ignore my direction regarding this matter. . . . Work priorities in the clari group are not your concern. If you choose to remain in the lopinavir/rotinavir group you will have to communicate with the group leader concerning the work priorities for that group. If you choose to take the alternative work assignment, as previously discussed, you will not have a need to send e-mails or communicate with anyone regarding the lopinavir/rotinavir group. . . .

(*Id.*, Ex. 8, Hoang Dep. Ex. 12, Letter from Wilson to Hoang of 11/29/01.)

On November 30, 2001, Abbott sent Hoang a letter with instructions for applying for family medical leave. (*Id.*, Ex. 9, Hoang Dep. Ex. 27, Letter from Brock to Hoang of 11/30/01.) The letter said she had to submit a completed medical certification form to Abbott "within 15 days from the date of this letter" or the absence could "be considered in future attendance counseling." (*Id.*)

On December 10, 2001, Abbott suspended Hoang's sick pay benefits because she had not submitted "acceptable medical certification [for her] request for sick pay" under the short-term sick pay program. (*Id.*, Hoang Dep. Ex. 28, Letter from Brock to Hoang of 12/10/01.) The letter also said she might be eligible for family medical leave if she submitted appropriate medical information "within 15 calendar days of [her] receipt of this letter." (*Id.*)

On December 18, 2001, Abbott notified Hoang that her request for short-term sick pay benefits had been denied as of November 26, 2001 because Abbott had "been unable to obtain acceptable medical certification to support [her] request." (*Id.*, Hoang Dep. Ex. 29, Letter from Brock to Hoang of 12/18/01.) The letter also said she might be eligible for family medical leave if

7

she submitted appropriate medical information "within 15 calendar days of [her] receipt of this letter." (*Id.*)

On December 19, 2001, Human Resources Director Perez received an envelope from Hoang containing notes dated November 12, and December 10, 2001 from Dr. Joseph Mason. (*Id.*, Ex. 8, Hoang Dep. Ex. 15, Note from Mason to Human Resource Abbott Labs of 11/12/01; *id.*, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01; Pl.'s LR 56.1(b) Stmt., Ex. J, Perez Dep. at 129.) The November note said: "Ms. Diep is under my care for emotional distress related to complaints of harassment at work. It is my medical opinion she should not return to work with Clarithromycin Group." (Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 15, Note from Mason to Human Resource Abbott Labs of 11/12/01.) The December note said: "Hoang is currently under my care and is unable to work for the next 30 days due to medical illness." (*Id.*, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01.)

On December 26, 2001, Montgomery, who had just returned to work from his own medical leave, sent a letter to Hoang saying:

> The purpose of this note is to let you know that people at Abbott missed you and are praying for your speedy recovery. If I was able to make it back, I am sure you would be able to also. I hope that you recover and are able to return soon. I hope you have a happy new year.

(Pl.'s LR 56.1(b)(3)(B) Stmt ¶ 27.)

On December 27, 2001, Abbott notified Hoang that she was not eligible for family medical leave because "[w]e did not receive a timely medical certification (within 15 days)." (Def.'s LR 56.1(a) Stmt., Ex. 9, Hoang Dep. Ex. 32, Letter from Abbott to Hoang of 12/27/01.)

On January 8, 2002, Lois Ford, Divisional Vice President of Human Resources, sent a letter to Hoang that said:

> It has come to our attention that you are personally in possession of laboratory notebooks containing important proprietary information belonging to Abbott. This is a serious violation of your Employee Agreement. You must contact your management immediately to arrange for the prompt return of these notebooks.
>
> If you do not contact your management by January 10, 2002, we will assume that you are not willing to voluntarily produce these documents. We will then be forced to take serious action with respect to your employment, as well as action to ensure the return of our property.

(*Id.*, Hoang Dep. Ex. 33, Letter from Ford to Hoang of 1/8/02.)

On January 16, 2002, Ford wrote another letter to Hoang, terminating her employment "due to [her] extensive absences from work and the fact that [she was] not on authorized leave of absence." (*Id.*, Ex. 8, Hoang Dep. Ex. 14, Letter from Ford to Hoang of 1/16/02.) The letter also said that Hoang's failure to return the laboratory notebooks at Abbott's request "further reinforced our decision to terminate your employment." (*Id.*) Montgomery had no involvement in the decision to terminate plaintiff. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.)[3]

Sometime after January 16, 2002, Abbott received another note from Dr. Mason dated January 10, 2002. (*Id.* ¶ 33.) The note said: "Diep Hoang is a patient under my care. She is unable to return to work for the next 30 days, due to severe medical illness." (Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 17, Note from Mason to Human Resources of 1/10/02.)

On November 12, 2002, Hoang filed a charge with the EEOC alleging race, sex, national origin and disability discrimination. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36.) The EEOC issued her a right to sue letter on January 31, 2003. (*Id.*)

On April 20, 2003, plaintiff filed this suit. (*Id.* ¶ 37.)

---

[3] Plaintiff denies that Montgomery was not involved, but the evidence she cites in support of that denial does not controvert that fact.

## Discussion

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

### Federal Claims

In the first count of her fourth amended complaint, Hoang alleges that she was subjected to sexual harassment by Montgomery in violation of Title VII from 1996 through her termination in January 2002. (Compl., Count I ¶ 17.) Abbott says this claim is time-barred because Montgomery's alleged harassment stopped long before plaintiff's termination and more than 300 days before plaintiff filed suit.

The Court agrees. Plaintiff admits that the last physical contact between she and Montgomery occurred in the summer of 2000 (Pl.'s LR 56.1(b) Stmt., Ex. F, Hoang Dep. at 364), and there is no evidence that they had any contact at all after Montgomery's get-well letter to her dated December 26, 2001. (*See id.* ¶ 27.) The record shows that Montgomery never directly supervised Hoang, and does not suggest that he had input of any kind into any of her performance reviews after 1998. (*See id.* ¶¶ 1-2; *id.*, Ex. A, Montgomery Dep. at 52-53.) Finally, there is no evidence that suggests

10

Montgomery made or contributed to the decision to terminate Hoang, which Abbott says was made by Ford. (*Id.* ¶ 35.)[4] Thus, viewed favorably to her, the record shows that Montgomery's alleged harassment ended, at the latest, on December 26, 2001.

"Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge either with the federal Equal Employment Opportunity Commission or the appropriate state agency...." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). Plaintiff filed her EEOC charge on November 12, 2002 (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36), more than 300 days after Montgomery's last alleged act of harassment. Accordingly, her harassment claim is untimely.

In Count II, plaintiff alleges that Abbott terminated her because of her gender in violation of Title VII. To defeat Abbott's motion on this claim, plaintiff must offer direct or circumstantial evidence that suggests the termination decision was motivated by her gender, or comply with the burden-shifting method of proof articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). Plaintiff attempts to do the former.

Plaintiff says Abbott's discriminatory animus can be inferred from a variety of Montgomery's actions and omissions, including his: (1) telling Clari Group members in the spring of 2001 to ignore Hoang's emails; (2) refusal to meet with Acquasaliente and Hoang in the fall of 2001 to discuss the Clari project; (3) failure in the spring of 2001 to defend Hoang from others' accusations that she was paranoid; (4) his inability to explain why Hoang was transferred out of the Clari Group when she returned from medical leave in February 1999; (5) his failure to admit to his supervisor, defendant

---

[4]*See* n.3.

Wilson, or employees of Abbott's human resources department that he had had sexual contact with Hoang; and (6) retrieval of data pertaining to Clari Group work from Hoang's cubicle after she was fired.

Even if all of those facts were supported by the record, and they are not, they still would not save plaintiff's discrimination claim. As noted above, there is no evidence that Montgomery contributed in any way to Abbott's decision to terminate plaintiff. (*See* Pl.'s LR 56.1(b) Stmt. ¶ 35.)[5] Absent such evidence, even if these "facts" suggested that Montgomery harbored gender bias, they would not support the inference that Ford terminated plaintiff because of her gender. Accordingly, Abbott is entitled to judgment as matter of law on Count II.

In Count III, plaintiff alleges that Abbott violated the ADA by refusing to accommodate her disability and firing her because of her disability. The ADA forbids employers to discriminate against any "qualified individual with a disability." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is a "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The accommodations to which plaintiff says she was entitled are (1) "a limited leave of absence"; (2) a "transfer[] away from people who had worked on the Clari projects." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 25.)

The record shows, however, that the leave of absence plaintiff sought was not "limited." It is undisputed that plaintiff last worked on November 20, 2001, and the evidence she offers shows that she would not have been able to return to work until sometime in February 2002. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17; *id.*, Ex. F, Hoang Dep. at 124; *id.*, Ex. L, Mason Aff. ¶ 11; Defs.' LR

---

[5]*See* n.3.

56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01.) In other words, the accommodation plaintiff sought was not having to work for more than two months.

In *Byrne v. Avon Products, Inc.*, however, the Seventh Circuit squarely rejected the notion that a "multi-month" leave of absence is a reasonable accommodation under the ADA:

> From November 1998 through mid-January 1999 Byrne . . . . was incapable of working. Byrne acknowledges this but contends that he should have been accommodated by being allowed *not* to work. That is not what the ADA says. The sort of accommodation contemplated by the Act is one that will allow the person to "perform the essential functions of the employment position." Not working is not a means to perform the job's essential functions. An inability to do the job's essential tasks means that one is not "qualified"; it does not mean that the employer must excuse the inability.
>
> Time off may be an apt accommodation for intermittent conditions. . . . But Byrne did not want a few days off or a part-time position; his only proposed accommodation is not working for an extended time, which as far as the ADA is concerned confesses that he was not a "qualified individual" . . . .

328 F.3d 379, 380-81 (7th Cir. 2003). Thus, *Byrne* dooms plaintiff's first accommodation.

Plaintiff fares no better with her second accommodation claim, that Abbott should have transferred her away from the Clari Group people, because there is no dispute that Abbott offered to do just that. (*See* Defs.' Mot. Strike Portions Pl.'s LR 56.1(b)(3)(C) Stmt. Add'l Facts, Ex. 2, Montgomery Dep. at 153-55 (discussing, in context of his performance review for that year, that the fermentation group had started reporting to him in 2002); Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 11, Letter from Wilson to Hoang of 11/21/01 & Ex. 12, Letter from Wilson to Hoang of 11/29/01 (offering Hoang a transfer to the fermentation group in November 2001).) Plaintiff's failure to take Abbott up on that offer does not subject it to ADA liability.

Abbott is also entitled to judgment on plaintiff's ADA discharge claim. As noted above, plaintiff's admitted inability to work for more than two months establishes that she is not a "qualified

individual with a disability," the only people to whom the statute applies. *Byrne*, 328 F.3d at 380-81; 42 U.S.C. §§ 12111(8), 12112(a). Therefore, the discharge claim fails.

## Count IV - Retaliation Title VII and ADA

In Count IV of the fourth amended complaint, plaintiff asserts that Abbott retaliated against her in violation of Title VII and the ADA by discharging her. Both statutes prohibit employers from discriminating against an employee because she has opposed any act prohibited by the statute or because she has made a charge of discrimination pursuant to it. 42 U.S.C. §§ 12203(a), 2000e-3(a). Plaintiff relies on the direct method of proof to defeat Abbott's motion on these claims, which requires her to offer evidence that she engaged in statutorily protected activity, suffered an adverse employment action, and there was a causal connection between the two. *Tomanovich v. City of Ind.*, 457 F.3d 656, 663 (7th Cir. 2006).

There is no evidence that plaintiff made a complaint about disability discrimination or otherwise opposed any act made unlawful by the ADA at any time before her termination. She has not, therefore, raised a genuine issue for trial as to her ADA retaliation claim.

The situation is different for the Title VII retaliation claim, but the result is the same. It is undisputed that plaintiff complained about Montgomery's alleged harassment in May 2001. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6.) It is also undisputed that Abbott terminated her in January 2002. (Defs.' LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 14, Letter from Ford to Hoang of 1/16/02.) There is, however, no evidence that the two events have a causal connection.

On the contrary, it is undisputed that in the period between plaintiff's complaint and her termination: (1) Acquasaliente, whom Hoang perceived as her nemesis from the Clari Group,

14

became Hoang's supervisor (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 10-11); (2) Hoang refused to attend one-on-one meetings with Acquasaliente, prompting him to contact Abbott human resources (*id.*); (3) Hoang had two meetings with Green, from Abbott human resources, and Wilson, Acquasaliente's boss, in which they offered her a transfer out of Acquasaliente's group (*id.* ¶¶ 15-17); (4) Hoang did not respond to the transfer offer and did not go to work after November 20, 2001 (*id.* ¶¶ 17-19); (5) Abbott sent Hoang numerous letters with instructions on how to apply for medical leave and benefits (*see* Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 12, Letter from Wilson to Hoang of 11/29/01; *id.*, Ex. 9, Hoang Dep. Ex. 27, Letter from Brock to Hoang of 11/30/01; *id.*, Hoang Dep. Ex. 28, Letter from Brock to Hoang of 12/10/01; *id.*, Hoang Dep. Ex. 29, Letter from Brock to Hoang of 12/18/01); (6) six weeks after her last day at work, Hoang sent Abbott a doctor's note that said she would be unable to work until mid-January 2002 (*id.*, Ex. 8, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01); and (7) on January 16, 2002, human resource representative Ford terminated Hoang's employment because of her extended absence from work without leave (*id.*, Ex. 8, Hoang Dep. Ex. 14, Letter from Ford to Hoang of 1/16/02; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.)[6] Because plaintiff has not raised a genuine issue as to whether her termination was causally related to her harassment complaint, Abbott is entitled to summary judgment on her Title VII retaliation claim.

## State claims

In Counts VI and VII, plaintiff asserts against the individual defendants state-law claims for false imprisonment and intentional infliction of emotional distress. Having dismissed all of the

---

[6]See n.3.

federal claims, the Court declines to exercise supplemental jurisdiction over these state claims. *See* 28 U.S.C. § 1367(c)(3).

## Conclusion

For the reasons stated above, there is no genuine issue of material fact on plaintiff's federal claims and defendants are entitled to judgment on them as a matter of law. Their motion for summary judgment on Counts I-IV [doc. no. 119] is, therefore, granted. The Court declines to exercise supplemental jurisdiction over the state-law claims plaintiff asserts in Count VI and VII, which are dismissed without prejudice to refiling in state court. Because the Court did not rely on any of the contested submissions in deciding the summary judgment motion, defendants' motions to strike [doc. nos. 139 & 141] are stricken as moot. This case is hereby terminated.

**SO ORDERED.**                  **ENTERED:** 9/28/07

                                             **HON. RONALD A. GUZMAN**
                                             **United States District Judge**